UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT PIERCE DIVISION

**ALBERT W. WILSON,**

        **Plaintiff,**                CASE NO: 2:21-cv-14036-AMC

**vs.**                             (Formerly St. Lucie County Circuit Court
Case No.: 2020-CA-1506)

**DEUTSCHE BANK NATIONAL TRUST
COMPANY, AS TRUSTEE,**

        **Defendant.**

_____/

## DEFENDANT'S MOTION FOR ATTORNEY FEES

Defendant, **DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE** ("DBNTC"), by and through undersigned counsel, hereby moves pursuant to 28 USC § 1927, to award attorney fees in favor of Defendant against Plaintiff's Counsel Lee Segal a/k/a Lior Segal ("Segal") and Segal and Schuh Law Group, P.L. and states as follows:

## I.    INTRODUCTION

This Motion details an egregious scam, committed by a Florida attorney, Lee Segal, to obtain a portfolio of high-value default judgments against large banking institutions, by failing to serve them with process, and by engaging in many other improper tactics.  This case is one of approximately *eighty* identical lawsuits filed in late-2020 against Deutsche Bank National Trust Company ("**DBNTC**") and The Bank of New York Mellon ("**BNYM**"). *See "*<u>**Exhibit 2**</u>".  As discussed below, Segal's scam actually began in late-2019 and early-2020, when Segal filed over a dozen "Test Cases" against many large financial institutions engaged in foreclosures to identify the victims of this scam. *Infra*, § III.A; "<u>**Exhibit 1**</u>".  Ultimately, Segal improperly obtained default judgments in these cases totaling more than ***thirty million dollars***—in just a few months,

without engaging in any substantive litigation, on frivolous claims.  *See again* Ex. 2.[1]

This Motion seeks, at a minimum, reimbursement for Defendant's attorney's fees and costs incurred in defending this lawsuit—by Segal personally. Of course, Defendant would be entitled to recover its attorney's fees against the individual plaintiffs, including under the RICO statute itself, but the sanctionable conduct in these cases, including making material misrepresentations to courts, was committed by Segal personally, and not the plaintiffs. Therefore, liability for attorney's fees should be imposed against Segal personally, as well as his law firm, Segal & Schuh Law Group, P.L.[2]

As the case law illustrates, the massive fraud that Segal has been perpetrating through the court system far surpasses the threshold for imposing sanctions. In fact, each of Segal's improper tactics has been found to be an independently sufficient basis to impose a fee award.  Taken cumulatively, the breadth of his scheme and its many improper features undoubtedly warrant sanctions. And it is only appropriate to view Segal's conduct in its entirety, especially given that each improper action was only one aspect of his overall scheme.  For example, it was not enough for Segal to not serve defendants with process, or to not mail any court filings to defendants despite claiming in certificates of service that he had, or to misrepresent to the courts that defendants had been personally served and failed to respond, while failing to disclose that defendants had received no notice of these cases, or to file these cases in random counties across the entire state based on false allegations.  Instead, he needed to do _all_ of those things, and more, to "successfully" perpetrate his scam.  And his remaining misconduct—such as filing frivolous complaints, and voluntarily dismissing cases in which the defendant discovered the lawsuit before default could be entered and then

---

[1] This Motion is supported by publicly-available court filings, as detailed in Defendant's accompanying Request for Judicial Notice.  The Court should consider the entirety of Segal's conduct in determining Segal's liability to Defendant for attorney fees. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 40, 57 (1991); *Danubis Grp., LLC v. Landmark Am. Ins. Co.*, 685 Fed. Appx. 792, 803 (11th Cir. 2017); *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 278 F.3d 175, 189 (3d Cir. 2002).

[2] *See Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980).

secretly re-filing the case in a new distant venue without any notice—is clearly sanctionable, *i.e.*, it was done in bad faith, vexatiously, or for oppressive reasons.

Viewed in its entirety, Segal's conduct reveals the true nature of his scam—to obtain and record massive default judgments against foreclosure plaintiffs, at any cost, and irrespective of Florida law or the ethical obligations of attorneys. Defendant is seeking reimbursement for the unnecessary and avoidable attorney's fees and costs that it has had to incur to address this misconduct, defend against this egregious scheme, and to uncover and vacate millions of dollars in void default judgments.

## II.  LEGAL STANDARD
### A.  The Courts' Inherent Power to Impose Sanctions.

Courts have the inherent power to police litigants and counsel appearing before them. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991).  A court's inherent power is "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Id.* at 43.  This power "must be exercised with restraint and discretion," and used "to fashion an appropriate sanction for conduct which abuses the judicial process." *Id.* at 44-45.  A court may exercise this power "to sanction a party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45-46.

"The key to unlocking that inherent power is a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998). "As a starting point, the inherent-powers standard is a subjective bad-faith standard." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1223 (11th Cir. 2017). When invoking its inherent power to address bad faith conduct, the Court must make specific findings as to the individual's conduct that warranted the relief awarded and the "court's inquiry should focus primarily on the individual's conduct and motive, rather than the validity of the case." *Wachovia Bank v. Tien*, 406 Fed. Appx. 378, 383 (11th Circ. 2010).

**B.   Liability for Attorney Fees under 28 U.S.C. § 1927.**

Pursuant to 28 U.S.C. § 1927[3]:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who **so multiplies the proceedings in any case unreasonably and vexatiously** may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

(emphasis added).   To justify an award, the basic rules governing motions under Section 1927 are: (1) the attorney engaged in unreasonable *and* vexatious conduct; and (2) the conduct multiplied the proceedings. *See Schwartz v. Millon Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003) (setting forth standards under § 1927; concluding § 1927 was designed to punish attorneys who "willfully abuse the judicial process by conduct tantamount to bad faith."). Indeed, *Million Air* explained the statute requires a determination that of bad faith, which is warranted when an attorney knowingly or recklessly pursues a frivolous claim. *Id. See also Rodriguez v. Marble Care Int'l, Inc.*, 863 F. Supp. 2d 1168, 1177–78 (S.D. Fla. 2012) (awarding fees and costs under 28 U.S.C. § 1927 against plaintiff's counsel for filing and maintaining a frivolous lawsuit).

## III.   SEGAL'S CONDUCT WAS UNREASONABLE, VEXATIOUS AND IN BAD FAITH
### A.   Segal filed a series of "Test Cases" to identify the victims of his scam.

From December 2019 to July 2020, Segal filed at least seventeen lawsuits, based on prior foreclosure cases, against nine different financial institutions: (1) DBNTC; (2) BNYM; (3) HSBC Bank USA,

---

[3] Motions under 28 U.S.C. § 1927 must be filed within a reasonable time after entry of Judgment. Fed. R. Civ. P. 54(d) recognizes that motions for sanctions under 28 U.S.C. § 1927 may be timely in appropriate circumstances despite being filed more than fourteen days after entry of judgment. Courts have consistently held that post-judgment motions for sanctions under Section 1927 are timely as long as they are filed within a reasonable time after entry of judgment. *See, e.g., In re Schaefer Salt Recovery, Inc.*, 542 F.3d 90, 102 (3d Cir. 2008) ("We need not define in this case the outer limits of 'reasonable' given that Segal filed his motion for sanctions a mere nine days after the Chapter 7 petition— the petition that 'multiplie[d] the proceedings'—was voluntarily dismissed.  Nine days clearly fits within any definition of 'outer limits.'"); *Ratliff v. Stewart,* 508 F.3d at 232 (5th Cir. 2007) ("Therefore, a district court has § 1927 available in its quiver where a party 'unreasonably and vexatiously' 'multiplies [judicial] proceedings,' § 1927, even if the subject matter of the suit has already been decided, and, indeed, even if the court constitutionally lacks jurisdiction over the principal dispute… Constitutionally, a party can obtain attorneys' fees even where its 'application [is] filed several years after the entry of a judgment on the merits.'"); *Steinart v. Winn Group, Inc.,* 440 F.3d 1214, 1223 (10th Cir. 2006) ("We simply conclude that § 1927 sanctions are not untimely if sought or imposed after final judgment.")

N.A.; (4) JPMorgan Chase Bank, N.A.; (5) Bank of America, N.A.; (6) Citibank, N.A.; (7) U.S. Bank, N.A.; (8) Stearns Bank, N.A.; and (9) Synovus Bank. *See* Ex. 1.  The chart of Test Cases shows two important facts: (1) Segal was able to obtain default judgments against DBNTC and BNYM based on "service" upon CT Corporation Systems (CT Corp); and (2) the other seven defendants appeared before default judgments were entered.  *Id.*

For example, on July 30, 2020, Segal filed three separate lawsuits in the **_same_** county on the **_same_** day on behalf of the **_same_** plaintiff—Jimmy Aviram—against three *separate* defendants: BNYM; Stearns Banks; and Synovus Bank. (Ex. 1, Rows 15-17). In the cases against Stearns Bank and Synovus Bank, the defendant appeared before default could be entered, and in response, Segal voluntarily dismissed both cases on the same day.  (Ex. 1, Rows 15-16).  Two days later, Segal obtained a default judgment against BNYM. (Ex. 1, Row 17). Clearly, Segal only intended to advance those cases in which a default judgment could be obtained. *See* Ex. 1. In fact, the vast majority of the Test Cases against the other defendants were voluntarily dismissed by Segal, or dismissed by the court at the outset. (Ex. 1, Rows 3, 4, 6, 8, 15, 16).  Obviously, none of these cases resulted in a judgment on the merits, or even survived the pleading stage.

After the Test Case period, Segal proceeded to file around *eighty* identical cases against DBNTC and BNYM.  Notably, after the Test Case period, Segal did not file a single case against any of the seven other defendants.[4] Ex. 2. Thus, through the Test Cases, Segal had identified *which* defendants might not respond to lawsuits, and then multiplied the proceedings by ramping up production of lawsuits against those particular entities.

---

[4] As Exhibit 2 details, approximately the first seventy cases were filed by Segal, and the rest were filed in the names of other attorneys to evade detection, based on identical filings, usually for the same clients, while Segal stayed involved in many of these cases. *See* Ex. 2, Row 40 (filed by Carla Turner-Hahn and summons required service on Segal; Segal took over case immediately after filing); Row 65 (filed by Megan Lazenby and summons required service on Segal); Row 38 (filed by Turner-Hahn and summons required service on Segal); Rows 43, 70 (Lazenby re-filed identical complaint previously filed by Segal; M.D. Fla. Case No. 2:21-cv-00080-SPC-NPM, Doc. 24 (Segal never formally appeared, but nevertheless signed the response letter to CT Corp, according to his client, Mark Stopa's affidavit).

**B.      In Bad Faith, Segal knowingly failed to serve DBNTC and BNYM with process and represented the opposite to the courts.**

Once Segal discovered an avenue for obtaining default judgments—by suing DBNTC and BNYM and "serving" them with process via delivery of all summonses and complaints solely to CT Corp—he quickly began filing several lawsuits each week against them in random counties throughout Florida. Ex. 2. His identical filings in these cases, and the timing of them, make clear that they are designed solely to obtain default judgments.  For example, he immediately sought clerk's defaults at the earliest opportunity, and he generally filed his motions for summary judgment after default *before* the clerk's defaults were even entered, with accompanying "affidavits" that were pre-executed. Ex. 2. Then he promptly submitted proposed judgments containing false findings, including statements that "Defendant failed to respond to the Complaint after personal service, resulting in a clerk's default." And that "[d]espite notice of this hearing, Defendant did not attend, much less counter the evidence submitted by Plaintiff." [Doc. 1-1, Page 61].

Several courts have already made clear in numerous decisions that service was fatally defective in these cases, against BNYM[5] and DBNTC.[6] In fact, the Middle District expressly "**WARNED**" Segal that he is at risk of sanctions for "asserting the same repeatedly unsuccessful and repeatedly unwarranted argument" in cases "featuring an identical (and improper) attempt to serve the defendant," in cases against both DBNTC

---

[5] *See* Case No. 5:21cv54-TKW-MJF, Doc. 25 (N.D. Fla. Mar. 29, 2021); Case No. 8:21-cv-469-WFJ-TGW, Doc. 37 (M.D. Fla. Apr. 13, 2021); Case No. 3:21cv251-MCR-EMT, Doc. 44 (N.D. Fla. Apr. 9, 2021); Case No. 9:21-cv-80319-AMC, Doc. 33 (Mar. 7, 2021); Case No. 8:21-cv-726-SDM-AAS, Doc. 36 (M.D. Fla. Apr. 19, 2021).
[6] *See* Case No. 2:21-cv-00042-SPC-NPM, Doc. 31 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00009-SPC-NPM, Doc. 30 (M.D. Fla. Mar. 1, 2021), Case No. 2:21-cv-00040-SPC-NPM, Doc. 26 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00039-SPC-NPM, Doc. 24 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00038-SPC-NPM, Doc. 29 (M.D. Fla. Mar. 1, 2021); Case No. 2:21-cv-00037-SPC-NPM, Doc. 30 (M.D. Fla. Mar. 1, 2021); Case No. 8:21-cv-00039-WFJ-TGW, Docs. 13, 15 (M.D. Fla. Jan. 22, 2021); Case No. 8:21-cv-338-T-23CPT, Doc. 21 (M.D. Fla. Mar. 12, 2021); Case No. 8:21-cv-349, Doc. 26 (M.D. Fla. Mar. 30, 2021); Case No. 8:21-cv-00630-WFJ-JSS, Doc. 31 (M.D. Fla. Mar. 31, 2021); Case No. 4:21-cv-53-AW-MAF, Doc. 27 (N.D. Fla. Mar. 12, 2021); Case No. 5:21cv14-TKW-MJF, Doc. 16 (N.D. Fla. Feb. 18, 2021); Case No. 8:20-cv-3090-VMC-AEP, Doc. 32 (M.D. Fla. Feb. 22, 2021); Case No. 8:21-cv-00276-AAS, Doc. 30 (M.D. Fla. Apr. 21, 2021).

and BNYM. Case No. 8-21-cv-00338, Doc. 21 (M.D. Fla. Mar. 12, 2021); Case No. 8:21-cv-726-SDM-AAS, Doc. 36 (M.D. Fla. Apr. 19, 2021).

Thus, the Middle District is already familiar with the service issues, including the fact that CT Corp exists for the limited purpose of receiving and forwarding service of process to its customers, *which do not include DBNTC or BNYM*.  Segal was acutely aware of this fact, including from his Test Cases in early-2020. Ex. 1. Indeed, as the numerous federal court decisions explain, it is well-documented that, in each of these cases, Segal promptly received a letter from CT Corp addressed to him personally that explained that CT Corp is *not* the registered agent for defendant, and that CT Corp was *unable* to forward service to the defendant. *See also* Doc. 1-1, Page 12. In response to being personally notified of these critical facts, Segal *never* disclosed any of this information to the courts, and he *never* attempted any other service method whatsoever. Ex. 2. The reason, of course, is that doing either of those things would have defeated his entire scam. But such tactics are clearly improper, as many courts have recognized: "*[Segal] owe[d] a heightened duty of candor to the clerk and court before seeking a default for 'failure to respond after personal service.' No doubt the state judge would have wanted to know that this 'personal service' was denied and disclaimed by the alleged agent served and no one had informed the actual defendant.  Had Mr. Segal filed his letter from CT Corporation with the clerk, no clerk's default would have been issued.  None of this was explained to the judge or the clerk.*" Case No. 8:21-cv-469-WFJ-TGW, Doc. 37, at 4-7 (N.D. Fla. Apr. 13, 2021) (emphasis added) ("At no time did [Segal] inform anyone (not the judge, the clerk, nor opposing counsel in the underlying, related foreclosure) that he was seeking full relief while the registered agent for a predecessor company denied service and declined to forward the papers to Defendant"; "This sharp practice is rendered more acute when the claimed registered agent expressly and promptly denies the agency and refuses to forward the papers").

Numerous courts have joined in recognizing Segal's improper motives and tactics behind his service scheme: "*Indeed, it appears that the location of the filing and the manner of service in this case **were***

**intended to ensure that Defendant would not get notice of this case**, *and in that regard, the actions of Plaintiff's counsel in this case have the same* **'stink of fraud-upon-the-court' (or at least unprofessional gamesmanship)** *as his actions in Kenny v. Deutsche Bank Nat. Trust Co.*, 2021 WL 778877, at \*4 (M.D. Fla. Mar. 1, 2021)." Case No. 5:21-cv-00054, Doc. 25 (N.D. Fla. Mar. 29, 2021) (emphases added).

Of course, courts do not condone attorneys making material misrepresentations and omissions to courts to gain a tactical advantage, especially in *ex parte* proceedings.  Rather, these unprofessional practices, which the Middle District has already observed, are patently sanctionable, on their own.  *See Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2011); *U.S. Bank Nat. Ass'n, N.D. v. Sullivan-Moore*, 406 F.3d 465 (7th Cir. 2005); *Barnes v. Dalton*, 158 F.3d 1212, 1213–14 (11th Cir. 1998); *see also* R. Regulating Fla. Bar: Rule 4-3.3(a)(1); R. Regulating Fla. Bar: Rule 4-3.3(c); R. Regulating Fla. Bar 4-8.4(c).

      **C.**      **In Bad Faith, Segal intentionally filed these cases throughout the entire state to gain an improper tactical advantage, based on complaints containing false allegations that the cause of action accrued in each county.**

The vast majority of these cases—approximately 70 of the 80 cases, including this case—were filed in counties that have *no* connection to the cause of action that form the basis for these complaints.  Ex. 2, Rows 13-46, 48-77, 79. To be clear, these complaints are based on litigating a foreclosure action and recording an assignment of mortgage *in a different county—i.e.*, the county in which the property is located. Yet, in each case Segal signed complaints containing the false jurisdictional statement such as "*the cause of action alleged herein accrued here*" or, as in this case, "[v]enue is proper in St. Lucie County" when St. Lucie County had no connection to the parties, property or instruments at issue. Doc. 1-1, Page 84, ¶2.  And, as discussed below, in some of the few cases that were originally filed in the proper county, Segal later re-filed those same complaints in a different improper county, thus necessitating that he make *contrary* assertions of fact to two completely different courts.  *Infra*, § III.D.

The obvious effect of Segal dispersing eighty lawsuits throughout nearly every county in the state— and not filing them in the proper counties—was to ensure that the different judges reviewing these cases

would not perceive any patterns, and to make it far more difficult for defendants to discover them.  In other words, these cases were not filed in the wrong county so that it would be more convenient for Segal to litigate, and less convenient for the defendants—*which itself would be improper*—but instead, for the far more egregious reason that scattering them throughout the state would make it much more likely that Segal would be able to improperly obtain default judgments without detection by defendants.

It has been readily apparent throughout this litigation that the chosen counties are improper. *See, e.g.*, Charlotte County Case No. 20000747CA (sua sponte order denying motion for summary judgment because, among other reasons, "[t]he allegations of the Complaint fail to allege any facts that would make Charlotte County a proper venue for this case."); Hardee County Case No. 25-2020-CA-000310 (same); Putnam County Case No. 20-CA-276 (Order denying motion summary judgment after default, stating: "When [Segal] was asked why this suit was brought in Putnam County, his answer was that Plaintiff and his former counsel had an agreement to bring suit in Putnam County, which is not sufficient to establish venue in this county."); Case No. 8:21-cv-000752-MSS-CPT, Doc. 25 (N.D. Fla. Mar. 29, 2021) (quashing service, vacating default, and transferring case to Middle District because "the case arose out of a foreclosure in Hillsborough County and the parties and their dispute have no connection to [the Northern District]").

At one point, the Northern District of Florida ordered Segal to show cause why the action was filed in Lafayette County which was clearly an improper venue. Segal's response was that, "***choice of venue lies with Plaintiff. If the Defendant disputes the venue selection, it must file a motion and prove that venue was improper***." Case No. 1:21-cv-15-RH-GRJ, Doc. 12 (N.D. Fla. February 26, 2021) (emphasis added).[7] Florida Statute § 47.011 provides three places where venue may be proper: the county where the defendant resides, the county where the cause of action accrued, and the county where the property in litigation is located. In this case *and so many others*, Segal failed and refused to follow this statute. In complete

---

[7] A copy of the Show Cause Order is attached hereto as **"Exhibit 3"**, and Segal's Response to the Order to Show Cause is attached hereto as **"Exhibit 4."**

derogation of Florida Statutes, Segal multiplied litigation by filing complaints in **any random county** of his "choice" and then required Defendant to litigate that "choice" of venue in order to **prove** what Segal was not complying with Florida Statutes. On this basis alone, Segal should be held accountable for attorney fees incurred in this litigation.

In *Methode Electronics, Inc. v. Adam Technologies, Inc.*, 371 F.3d 923 (7th Cir. 2004), the court affirmed sanctions and attorney's fees under the district court's inherent power because the district court found "not only that [plaintiff's] venue allegations were false, but that [plaintiff's] conduct in advancing them was intentionally deceptive." *Id.* at 928. In that case, the court awarded monetary sanctions against the plaintiff's attorney who signed the complaint based on that *one* instance of making false allegations as to venue, for the purpose of trying to gain some tactical advantage in the litigation. *Id.*

Segal's conduct far exceeds the conduct in *Methode* or in any other known case.  Segal filed identical lawsuits in nearly every county in Florida, without any connection to the venues chosen, based on false allegations, so that his complaints and default judgments would remain undetected. Clearly that is improper and sanctionable.

> **D.** **Segal vexatiously and unreasonably multiplied the proceedings by voluntarily dismissing cases after defendants appeared before default was entered, and then re-filing the complaints in other venues, without any notice to defendants or their counsel of record.**

Perhaps the most egregious conduct committed by Segal—and the clearest indication that these cases are designed *solely* to obtain secret default judgments, at any cost—is what Segal did in the numerous cases where he was not able to obtain a quick default judgment. Remarkably, in these situations, Segal simply dismissed the case, and then surreptitiously re-filed it in a different county, without any notice to the defendant or its counsel of record. *See, e.g.*, Ex. 2, Rows 3, 5, 6, 10, 13, 14, 19, 34, 35, 52, 53, 58, 73, 74. In fact, well over a dozen of these cases were re-filed in different counties based on identical complaints, meaning that at least *thirty* of the total lawsuits filed against DBNTC and BNYM involve complaints that have

been re-filed in different counties.  Ex. 2, Rows 1-6, 9, 10, 12-14, 16, 17, 19, 24, 25, 28, 30, 34, 35, 43, 51-54, 58, 70, 73-75. Obviously, the sole purpose in dismissing and re-filing these cases, without providing any notice to the defendant or its counsel of record, was to obtain an improper tactical advantage—*i.e.*, a default judgment based on the same claim.

For example, in the case of *Inland Assets LLC As Trustee Of 4417 Rudder Way*, Segal filed the Complaint in Pasco County on August 11, 2020 on a pending Pasco County foreclosure action. (Ex. 2, Row 10). After the Pasco County court refused to enter summary judgment by default and sua sponte consolidated the action with the pending foreclosure action, Segal voluntarily dismissed the complaint. <u>Twenty-four minutes later</u>, Segal re-filed the identical Complaint in Columbia County. (Ex. 2, Row 58).[8] In the Pasco County case, Segal identified the plaintiff as "***Inland Assets, LLC, as Trustee of the 4417 Rudder Way Land Trust***." Ex. 2, Row 10. To make detection of the second case more difficult, Segal identified the plaintiff in Columbia County as "***4417 Rudder Way Land Trust, By: Inland Assets, LLC, Trustee***." Ex. 2, Row 58. Clearly, when Segal could not get an easy judgment by default, Segal actually shopped his case to a different forum seeking a judge that would enter default judgment by overlooking his meritless claims and defective service of process.

See also the various *Weber* cases. (Ex 2, Row 14, 16, 28, and 52)[9]. The first *Weber* case was filed on August 13, 2020 (Ex. 2, Row 14). In that matter, Segal filed a complaint against DBNTC in Lee County based on a pending Hillsborough County foreclosure action. DBNTC's counsel promptly appeared in that case and filed a motion to dismiss.[10] While the parties were discussing the issue of venue pursuant to court order, Segal voluntarily dismissed the Lee County case. But, sixteen days *before* dismissing the case, and

---

[8] *See also* **"Exhibit 5"** attached hereto (including Pasco Voluntary dismissal filed at **3:39pm on October 20, 2020** and re-filed Complaint (first page only) **at 4:23pm on October 20, 2020** in Columbia County.
[9] The conduct in the *Weber* cases identified in Rows 16 and 28 are described in § III.E.
[10] DBNTC's counsel in that matter regularly monitors Lee County dockets and alerts their clients when a lawsuit is filed against them, which is how the Lee County case was discovered.

while the parties were discussing that any re-filed case should be filed in Hillsborough County, Plaintiff re-filed the same complaint in St. Johns County, *without notifying defendants counsel of the re-filed case*, *despite defendant's counsel's explicit request to be notified of any re-filed case*. (Ex. 2, Row 52). As intended, that led to a default against DBNTC in the re-filed case, which Segal refuses to vacate.[11] [12]

    **E.**    **Segal vexatiously and unreasonably multiplied the proceedings by obtaining multiple judgments on the same claim.**

Under more egregious circumstances, on August 20, 2020 Segal filed another Complaint on behalf of Mr. Weber. This time, the Complaint was filed in Collier County, Florida claiming the cause of action accrued there. (Ex. 2, Row 16).  Two weeks later, while the Collier case was still pending, Segal filed the *identical* Complaint in Lafayette County, Florida alleging the cause of action accrued there. (Ex. 2, Row 28). With the exception of the false venue allegation, the Collier and Lafayette Complaints are word-for-word identical pleadings. After engaging in the same defective service of process scheme set forth above, Segal proceed to obtain identical default judgments in both cases. That is, Segal obtained a default judgment in the

---

[11] Those cases are not isolated examples, but instead, are representative of Segal's improper tactics throughout. See Ex. 2, Rows 1-4, 6, 9, 12, 13, 16, 17, 19, 24, 25, 28, 30, 34, 35, 43, 51, 54, 70, 73-75. The Middle District has recognized the improprieties of Segal's tactics, including obtaining defaults in new cases without providing any notice to defendant's counsel of record, contrary to Florida law, and improperly re-filing these cases in new counties. See Case No. 8:21-cv-469-WFJ-TGW (M.D. Fla. Apr. 13, 2021) ("[Plaintiffs] and their lawyer Mr. Segal were litigating for several years with the same bank over the same land, in the same courthouse, with a similar cause of action… They were not at liberty to steal a march or sneak in a clerk's default at the same time in a new, related case they informed no one about… Failure to alert fellow counsel before moving for a clerk's default in this related suit with the same parties requires the default to be vacated."); Case No. 2:21-cv-00047-SPC-NPM, Doc. 25 (M.D. Fla. Apr. 3, 2021); Pasco County Case No. 2020-CA-1437.

[12] For example, in *Hayden v. Vance*, 708 Fed. Appx. 976 (11th Cir. 2017), the Eleventh Circuit affirmed sanctions where the plaintiff attempted to relitigate the same issues and to attack a state court judgment by filing multiple complaints, explaining "that Plaintiff simply will not accept the state court judgment and keeps court shopping in the vain hope to find someone who will agree with him." *Id*. at 978-79; *see also Arunachalam v. Int'l Bus. Machines Corp.*, 989 F.3d 988, 997 (Fed. Cir. 2021) ("Even after the dismissal of her RICO claims against [defendants] in the District Court, [plaintiff] reasserted those same claims against [defendants] in another action in the U.S. District Court for the Northern District of California, further evidencing her vexatious and bad faith conduct."); *Fritz v. Honda Motor Co.*, 818 F.2d 924, 924–25 (D.C. Cir. 1987).

amount of **$858,907.50 in Lafayette County** and an identical  default judgment in the amount of **$858,907.50 in Collier County** for the same claim, same purported conduct and same cause of action.[13]

Upon discovery of the cases, undersigned counsel demanded the subsequent identical case be dismissed and judgment vacated, but Segal refused. Upon being ordered to show cause why the case should not be dismissed for Segal's conduct, Segal filed a response on February 26, 2021, feigning ignorance to the multiple claims and asserted the duplicity was merely inadvertent. Case No. 1:21-cv-00015-RH-GRJ, Doc. 12 (N.D. Fla. February 26, 2021).  Aside from the forgoing history demonstrating the duplicate filings were calculated and intentional, Segal's ignorance here is impossible because Segal actually took affirmative action to move the case forward. That is, the case did not sit dormant and undetected in the Court's docket, but rather, Segal appeared for hearings and presented "evidence" in support of Summary Judgment. The evidence presented is notable here because Segal only obtained one (1) affidavit from Mr. Weber in support of one (1) judgment …and it was filed with the Collier County case caption across the top of the Affidavit.[14] In order to dupe a second court into entering a second judgment on the same affidavit, *someone* had to conceal the Collier County case caption by 'cutting and pasting' the Lafayette case caption *on top of* the Collier case Affidavit.[15]  Then, Segal presented the concealed Collier Affidavit to the Lafayette County Court and represented that relief was still necessary in Lafayette County even though Mr. Weber already held a judgment in the amount of almost $1,000,000 in Collier County *for the same allegations, legal theory and claim for relief*.

Those cases are not isolated examples, but instead, are representative of Segal's improper tactics throughout. *See* Ex. 2, Rows 1-4, 6, 9, 12, 13, 16, 17, 19, 24, 25, 28, 30, 34, 35, 43, 51, 54, 70, 73-75. Numerous courts have recognized the improprieties of Segal's tactics, including obtaining defaults in new

---

[13]  *See also* Request for Judicial Notice of Weber Filings filed in conjunction with this motion.
[14] *See again* Request for Judicial Notice of Court Filings (Weber's Collier Affidavit).
[15] *See again* Request for Judicial Notice of Court Filings (Weber's Lafayette Affidavit).

cases without providing any notice to defendant's counsel of record, contrary to Florida law, and improperly re-filing these cases in new counties. *See* Case No. 8:21-cv-469-WFJ-TGW (M.D. Fla. Apr. 13, 2021) ("[Plaintiffs] and their lawyer Mr. Segal were litigating for several years with the same bank over the same land, in the same courthouse, with a similar cause of action… They were not at liberty to steal or march or sneak in a clerk's default at the same time in a new, related case they informed no one about… Failure to alert fellow counsel before moving for a clerk's default in this related suit with the same parties requires the default to be vacated."); Case No. 2:21-cv-00047-SPC-NPM, Doc. 25 (M.D. Fla. Apr. 3, 2021); Pasco County Case No. 2020-CA-1437.

An award of attorney fees is appropriate for this type of improper conduct, including attempting to re-litigate the same issues in multiple forums, obtaining duplicative judgments by misrepresentation, and for seeking defaults against defendants without providing notice to defendant's counsel.

      **F.**    **Segal's complaints and filings in these cases were frivolous, were filed in bad faith, and served to vexatiously multiply the proceedings.**

Segal's identical complaints in these cases—and his entire theory for liability—merely recycles frivolous and nonsensical foreclosure "defenses" that Florida's state courts have rejected in countless cases. *See, e.g.*, *HSBC Bank USA, Nat'l Ass'n v. Buset*, 241 So. 3d 882, 889-891 (Fla. 3d DCA 2018); *Citibank, N.A. v. Olsak*, 208 So. 3d 227 (Fla. 3d DCA 2016). In short, Segal alleges that the defendants lacked standing to foreclose because "it was illegal for Defendant to own or hold the Notes," even though Florida law is clear that they were entitled to foreclose (as they proved in the foreclosure cases) because they were in possession of the original promissory notes endorsed in blank. *Id.* On top of that, Segal attempts to turn his disagreement with well-settled Florida law on standing to foreclose into a RICO claim, despite failing to allege any of the necessary elements of a RICO claim. And, even assuming these complaints somehow stated a claim, they are still clearly barred by res judicata, collateral estoppel, and the litigation immunity privilege, and were compulsory counterclaims in the foreclosure cases. Also, as a reflection of the utter frivolousness of these

cases, many of them involve signed settlement agreements between the parties, expressly releasing plaintiff's "claims." *See e.g.,* Ex. 2, Rows 36, 40, 56, 57.

In the previously mentioned *Hahn* case (Ex 2, Row 6), Segal was counsel for the Hahns in the foreclosure action and directly participated in the drafting and execution of the foreclosure settlement agreement. The agreement specifically released any and all claims —of whatever kind or nature— that was or could have been raised by Hahns.[16] Despite (a) Segal's participation in the drafting language of the release, (b) Hahn's execution of the release, and (c) filing a *dismissal with prejudice* of the RICO claims…Segal proceeded to file yet another duplicative RICO action—*without disclosing its existence to undersigned counsel* — in unrelated Polk County. (Ex. 2, Row 13; Case 8:21-cv-39-T-02TGW). At all times, Segal refused to vacate the default in Polk County, refused to honor the settlement agreement and refused to dismiss the Polk County action. Instead, DBNTC was required to incur the unnecessary expense of removing the case to Federal Court, filing a Motion to Quash Service of Process *and* responding to Segal's Motion for Remand.

Although these cases do not get litigated on the merits, some courts have nevertheless commented on them, including state court judges who refused to enter default judgments. *See, e.g.*, Charlotte County Case No. 20000747CA (denying motion for summary judgment after default, sua sponte, because, among other reasons, "[t]he allegations of the two counts fail to state a cause of action," and "[t]his case appears to be an improper collateral attack on two other actions")[17].

---

[16] The Settlement Agreement was executed by Segal 's client on October 16, 2020 in *Deutsche Bank Nat'l Tr. Co., as Trustee for GSAA Home Equity Trust 2006-10, Asset-Backed Certificates, Series 2006-10 v. Jeffrey M. Hahn and Carla Turner-Hahn, et al.* bearing Pinellas County Case 15-005650-CI. The release specifically identified an released any RICO/civil theft claims asserted by Segal's client including the Complaint filed *Hahn v Deutsche Bank Nat'l Tr. Co.*, Pinellas County Case 20-003116-CI ("RICO claim") The RICO claim was dismissed *with prejudice* on December 2, 2020.

[17] *See also* Case No. 8:21-cv-000752-MSS-CPT, Doc. 25 (N.D. Fla. Mar. 29, 2021) ("The complaints in each case are fundamentally identical except for the quintessential variables of the plaintiff and property. But these facts are virtually irrelevant to the legal claims as currently pled. Indeed, the allegations as to the supposed fraudulent behavior in each of the underlying foreclosure actions is generalized and not case specific.")*;* Case No. 2:21-cv-00040-SPC-NPM, Doc.

Obviously, these complaints were never intended to be litigated on the merits. In fact, as discussed above, Segal voluntarily dismissed these cases if the defendant appeared before default was entered. *Supra*, § III.D. To date, the Courts have unanimously and consistently quashed Segal's defective service of process on DBNTC and BNYM. And, in each of those quashed cases, Segal abandoned his cases a never attempted legitimate service on either DBNTC or BNYM. Indeed, not one if these case has been litigated on its merits *because* Segal dismisses the cases or permits the court to dismiss for lack of prosecution/service of process before any merit can be considered.

Never once has Segal attempted to prosecute the merits of a case after defense counsel appeared. But the fact that these frivolous complaints were filed in the first-place merits sanctions, because knowingly pursuing frivolous claims, on its own, warrants sanctions against Segal under the court's inherent authority.[18]

Here, Segal—who is an experienced foreclosure defense attorney, and therefore well aware that these foreclosure "defenses" are not supported by Florida law, and obviously fail to establish a RICO claim— has knowingly filed identical frivolous complaints in each of these cases. That alone merits sanctions.

G.      **Segal's summary judgments in these cases were frivolous, were filed in bad faith, and served to vexatiously multiply the proceedings.**

Separately from Segal's service of process scheme, he wrongfully obtained summary judgment through procedurally improper means. Segal's summary judgment scheme was to improperly seek liquidated damages by virtue of self-serving "affidavits" in violation of the defendants right to a jury trial on the amount of damages, *regardless of default. See* Fla. R. Civ. P. 1.440(c); *MacDonnell v. U.S. Bank N.A.*, 293 So. 3d

---

26 (M.D. Fla. 1, 2021); Case No. 2:21-cv-00037-SPCNPM, Doc. 30 (M.D. Fla. Mar. 1, 2021); Case No. 2:21- cv-00042-SPC-NPM, Doc. 31 (M.D. Fla. Mar. 1, 2021); 2:21-cv-00039-SPC-NPM, Doc. 24 (M.D. Fla. Mar. 1, 2021); 2:21-cv-00038-SPC-NPM, Doc. 29 (M.D. Fla. Mar. 1, 2021); 2:21-cv-00009-SPC-NPM, Doc. 30 (M.D. Fla. Mar. 1, 2021)

[18] *See Peer v. Lewis*, 571 Fed. Appx. 840, 843 (11th Cir. 2014); *see also Arunachalam v. Int'l Bus. Machines Corp.*, 2021 WL 772260 (Fed. Cir. Mar. 1, 2021); *Eldredge v. EDCare Mgmt., Inc.*, 766 Fed. Appx. 901, 905 (11th Cir. 2019); *Terra Partners v. Rabo Agrifinance, Inc.*, 504 Fed. Appx. 288, 290 (5th Cir. 2012); *Maid of the Mist Corp. v. Alcatraz Media, LLC.*, 446 Fed. Appx. 162, 164-65 (11th Cir. 2011); *Torres v. City of Orlando*, 264 F. Supp. 2d 1046, 1053 (M.D. Fla. 2003); *McLaughlin v. Bradlee*, 602 F. Supp. 1412, 1417 (D.D.C. 1985), *aff'd,* 803 F.2d 1197 (D.C. Cir. 1986).

585, 589 (Fla. 2d DCA 2020). Therefore, it was improper for Segal to obtain default judgments, like the one in this case, through motions for summary judgment in the first place. Furthermore, these "affidavits"—which merely state that someone reviewed Realtor.com or Zillow.com—were still inadmissible and insufficient to establish any damages. *See, e.g.*, Charlotte County Case No. 20000747CA (sua sponte order denying motion for summary judgment because, among other reasons, "[t]he affidavit of damages is insufficient under Florida law," and "the damages in this case are unliquidated so any trial must be noticed as a jury trial"); *see* Fla. R. Civ. P. 1.510; *Fla. Dep't of Fin. Servs. v. Associated Indus. Ins.*, 868 So. 2d 600, 602 (Fla. 1st DCA 2004).[19] In reality, each of these motions and affidavits were improper and filed in bad faith for the sole purpose of obtaining default judgments for exorbitant amounts.

In addition, once the defendant discovered the lawsuit and appeared after a default was entered, Segal engaged in a ruthless campaign in the state courts of filing baseless motions that served to multiply the proceedings. In response to the defendant appearing in the case and moving to quash service and vacate the defaults (because Segal refused to agree to vacate the defaults), Segal immediately responded by filing completely baseless motions to disqualify defendant's counsel and for sanctions in the state courts in effort to delay and prevent adjudication of defendant's motions to vacate. And in the federal courts, he filed unsupported motions for remand and oppositions to defendants' motions to vacate defaults, including failing to even address the fact that these defaults all need to be vacated because defendants had a good faith basis for not responding to the summonses and complaints that they never received.

This type of conduct—which requires his adversaries and the courts to needlessly engage in extensive work to obtain the same results that defendants are seeking from the outset—is another clear

---

[19] The Plaintiffs in these cases are largely shell corporations owned by disbarred former Florida attorney, Mark Stopa. Obviously, trying to prove at trial that these shell companies, who purchased these properties subject to senior lien foreclosure cases for pennies on the dollar, incurred actual damages in these frivolous cases likely would have been impossible. It also would have exposed Segal and his "client" to obvious risks and sanctions, including perjury. Presumably that is why the "affidavits" do not reference "damages" whatsoever, or even attempt to explain how the plaintiff was injured.

example of vexatiously multiplying the proceedings, and it merits sanctions. *See, e.g.*, *Fritz v. Honda Motor Co.*, 818 F.2d 924, 924–25 (D.C. Cir. 1987) (affirming sanctions and attorney's fees against plaintiff's counsel under court's inherent authority and 28 U.S.C. § 1927 where district court found that plaintiff's counsel "repeatedly took actions which required [defendant] to expend unnecessary time and money, even though he had no intention of pursuing this litigation in federal court," and specifically, that he "refused to dismiss the complaint voluntarily after being informed by defendants' counsel that service of process … had been defective, thereby forcing [defendant] to file a motion to dismiss to which [plaintiff's counsel] made no opposition").

Segal's complaints, and most of his motions, filings and other litigation conduct, were frivolous, filed in bad faith, objectively unreasonable, and served to vexatiously and unreasonably multiply the proceedings. Accordingly, an award of attorney fees is proper.

### H. Segal intentionally failed to serve defendants with court filings, contrary to his certificates of service, as doing so would have defeated his entire scam.

Segal's entire scheme depended on DBNTC and BNYM not receiving *any* notice of these cases whatsoever, including *any* of his court filings. But at the same time, Segal had to include certificates of service on his court filings in order to obtain default judgments. The record in these cases, which includes dozens of signed affidavits from DBNTC and BNYM, confirms that they received *none* of Segal's filings. *See* Doc. 16-1, Page 5, ¶15 (Affidavit of R. Reyes of DBNTC).

After defendants began discovering and defending these cases, Segal personally attested, under penalty of perjury, that he prepared and sent letters to CT Corp in response to the rejection letters, in approximately *thirty* cases, in an effort to bolster his position that service was proper. **However, CT Corp did not receive any of Segal's letters.** Attached as "**Exhibit 6"** is an Affidavit of CT Corp, attaching those thirty affidavits and letters, and attesting in detail that "CT Corp. has no record of ever having received any of the Response Letters in any of these [thirty] cases." Ex. 6, ¶21. (*See also id.*, ¶22 "If the Response Letters had

actually been mailed, CT Corp. would have received them, would have maintained records relating to them, and would have responded to them.").

And not only did CT Corp never receive any of Segal's response letters, but some of Segal's own letters and affidavits lack credibility. In Middle District Case No. 8:21-cv-00469, Segal filed an affidavit on March 22, 2021, attesting, under penalty of perjury, that he mailed a particular response letter on May 7, 2020 (*id.*, Doc. 20), but the actual response letter references his related case (2020-CA-148) that was not even filed until three and a half months later—on August 24, 2020 (*id.*, Doc. 20-1).[20] [21]

The reason for not mailing documents in these cases, including court filings to defendants, is that doing so would have prevented Segal from achieving his sole objective—obtaining default judgments. But failing to mail court filings to parties, contrary to signed certificates of service, is sanctionable. *See, e.g.*, *Jade Winds Ass'n, Inc. v. Citibank, N.A.*, 63 So. 3d 819, 822 (Fla. 3d DCA 2011); R. Regulating Fla. Bar 4-3.5. And of course, committing perjury in a case, to gain an advantage in the litigation, would be a very serious offense worthy of sanctions.

Accordingly, based on the totality of Segal's actions in these cases, as well as his individual improper tactics, sanctions and attorney's fees should be awarded.

IV.     **CONCLUSION**

The tactics and gamesmanship employed by Segal in perpetuating his vexatious scheme against foreclosing lenders here is far worse than in any other case law cited in this brief wherein fees and costs were awarded.

---

[20] Interestingly, it appears that Segal's mail may be handled by disbarred attorney Mark Stopa. *See, e.g.*, M.D. Fla. Case No. 2:21-cv-00080-SPC-NPM, Doc. 24 (Stopa's affidavit attesting that Stopa "personally mailed" the response letter to CT Corp that was signed by Segal, with attorney Lazenby's letterhead, even though Segal had never formally appeared).

[21] *See* Request for Judicial Notice of Segal Affidavit.

WHEREFORE, Defendant respectfully requests an award of Defendant's reasonable attorney's fees and costs incurred in defending this action, jointly and severally against attorney Lee Segal a/k/a Lior Segal and his firm, Segal & Schuh Law Group, P.L. Pursuant to Local Rule 7.01(b)(2), Defendant estimates its attorney's fees and costs to be approximately $12,000. Defendant also requests any additional and further relief that this Court deems just and proper.

### LOCAL RULE CERTIFICATION

Pursuant to Local Rules, undersigned counsel personally certifies that counsel for Defendant has conferred with Plaintiff's counsel by telephone on May 20, 2021 in a good faith effort to resolve the issues raised in this motion and have been unable to reach an agreement.

Dated: June 10, 2021                                    Respectfully submitted,

Jason H. Okleshen, Esq.                        Beth A. Norrow, Esq.
Florida Bar No. 496170                          Florida Bar No. 061497
Okleshenj@gtlaw.com                           norrowb@gtlaw.com
FLService@gtlaw.com                            sandra.famadas@gtlaw.com
GREENBERG TRAURIG, P.A.                 GREENBERG TRAURIG, P.A.
777 S. Flagler Dr., Suite 300 East          777 S. Flagler Dr., Suite 300 East
West Palm Beach, FL 33401                  West Palm Beach, FL 33401
Telephone: (561) 650-7915                   Telephone: (407) 418-2345

                                                             By: /s/ Beth A. Norrow
                                                                    Beth A. Norrow

*Counsel for Deutsche Bank National Trust Company, As Trustee*

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 10, 2021, a true and correct copy of the foregoing was filed with the Clerk of the Court using the State of Florida e-filing system which will send a notice of electronic service to:
Lior Segal, Esq.
SEGAL & SCHUH LAW GROUP, P.L.
18167 US Hwy 19 North, Suite 100
Clearwater, FL 33764
lee@segalschuh.com
marie@segalschuh.com

                                                   /s/ Beth A. Norrow
                                                   Beth A. Norrow